CAROLINE V. ROBERTSON *vs.* MILLON A. BERRY and
OTHO SWINGLEY, Co-partners, and others.

*Property right of an Author or Publisher in the Title, Name*
*or Particular Marks of his Work—Protection in Equity*
*against their Use and Imitation by another— What consti-*
*tutes a Fraudulent or Colorable Imitation—Property right*
*in the Devices, Emblems and Title-Pages of an Almanac.*

A publisher or author has either in the title of his work, or in the
application of his name to the work, or in the particular marks
which designate it, a species of property similar to that which a
trader has in his trade-mark, and may, like a trader, claim the pro-
tection of a Court of equity against such a use or imitation of the
name, marks or designation, as is likely in the opinion of the
Court, to be a cause of damage to him in respect of that property.
This doctrine, in cases where the facts are sufficient to sustain it,
has been held applicable to such periodical publications as news-
papers, magazines and almanacs.    To entitle a complainant to
relief he must clearly show a property right in himself, and a
fraudulent or colorable imitation by the defendant.

It is impossible to lay down any general rule as to what degree of
resemblance between the symbols, marks and devices used on one
publication and those used on another, is necessary to constitute a
fraudulent or colorable imitation.    All that can be done is to ascer-
tain in every case as it occurs, whether there is such a resemblance
as that ordinary purchasers purchasing with ordinary caution are
likely to be misled.

A property right may be acquired in the devices, emblems and title-
pages of an almanac by adoption and user.

APPEAL from the Circuit Court of Baltimore City.

The facts of the case are stated in the opinion of the
Court.

The cause was argued before BARTOL, C. J., BRENT, MIL-
LER, ALVEY and ROBINSON, J.

*S. T. Wallis,* for the appellant.

Upon the general law of trade-marks the appellant's counsel referred to *Stonebraker vs. Stonebraker,* 33 *Md.,* 263, 268; *Canal Co. vs. Clark,* 13 *Wallace,* 322.

No person has a right to monopolize the name of a place or a geographical district, as an element in a trade-mark. *Canal Co. vs. Clark, ubi supra.*

The registration of a trade-mark is not conclusive, in favor of the right to claim it. *Moorman vs. Hoge,* 2 *Sawyer,* 78. And, indeed, the whole trade-mark legislation of Congress is unconstitutional. *Lindendorf vs. Flint,* 6 *Reporter,* 737.

Gruber's title to his trade-mark, if he had any, and if it were assets, could only pass by way of administration. *Cecil vs. Rose,* 17 *Md.,* 101, 102; *Same vs. Clarke, ibid,* 520, 521.

And the recent and ancillary administrations by Mr. Gans on the estates of Gruber and his descendants, *post litem motam,* were too long after Gruber's death to give any validity retroactively to the trade-mark claims set up by his descendants as derived from him.

But the good-will of a printing office, which is all that the parties really claimed, until of late and with a view to this controversy, is not assets. *Seligman vs. Marshall,* 17 *Md.,* 569.

The appellees, having derived no title or right lawfully from Jacob Gruber, and having printed their almanac for many years under a false pretence of such title, and sometimes as individuals, now one, now many, have no right under Gruber upon which they can maintain their present proceeding, or appeal to a Court of equity. They have no standing in Court, upon the ground of a violation of their own original rights created and secured by their own dealing with the alleged trade-mark and their own skill and labor since Gruber's death; for that is not the case made by their bill, and to maintain their interlocutory injunction they must rest on their bill only.

*Edgar H. Gans* and *John P. Poe*, for the appellees.

The marks used by the appellees can in their own nature be trade-marks either singly or in their collocation, for a trade-mark may consist in any sign or symbol, or a picture made up of many objects, that can distinguish the goods of one man from those of another. *Browne on Trade-Marks, secs.* 87, 259, 269.

The only possible objection that can be urged against these marks, being trade-marks, is, that the thing which they designate, being the subject of a copyright, cannot be protected by a trade-mark. But this objection confounds literary property with merchandise. A book or magazine, as literary property, is protected by its copyright, but as a piece of merchandise may be protected by a trade-mark just as any other vendible article. *Browne on Trade-Marks, secs.* 116, 117, 118, 553, 558; *Spottiswoode vs. Clark,* 10 *Jurist,* 1043; *Swift vs. Day,* 4 *Robertson,* 611.

The property in these marks is shown to be in the appellees. An inspection of the will of John Gruber shows that of these trade-marks he died intestate. After his death his distributees continued to have an inchoate title in said marks until the year 1878, when their title was made complete by the distribution of the administrator *d. b. n. c. t. a.*, who was appointed in that year. *Cecil, Adm'r of Owens vs. Negro Rose,* 17 *Md.,* 92; *Dixon Crucible Co. vs. Guggenheim, Am. Trade-Mark Cases,* 559, 576.

The first aspect of the case treats the alleged wrong as an infringement of property rights, and regards the infringement of the marks as a wrong remediable by injunction, even though innocently done. *Stonebraker vs. Stonebraker,* 33 *Md.,* 252–268; *Amoskeag Mfg. Co. vs. Spear,* 2 *Sand. S. C.,* 609; *Browne on Trade-Marks, sec.* 393; *Millington vs. Fox,* 3 *Mylne & Craig,* 338–352.

But the case in its second aspect, is a case of unlawful competition by the use of simulated labels.

The law recognizes the good-will of a business as valuable property. When that good-will is preserved by the use of labels or names which serve the purpose of pointing out to the trade generally the property of the owner of the good-will, a Court of equity will enjoin the use of a fraudulent imitation of those labels and names, even though they are not and cannot be trade-marks. *Guerand vs. Dandelet*, 32 *Md.*, 569; *Warfield vs. Booth*, 33 *Md.*, 63; *Witthaus vs. Mattfeldt & Co.*, *et al*, 44 *Md.*, 303.

The principle upon which the Court proceeds is, that no man has a right to sell his own goods as the goods of another; or in other words, no man has a right to dress himself in the colors, or adopt and bear symbols to which he has no peculiar and exclusive right, and thereby personate another for the purpose of inducing the public to suppose that he is that other person, or that he is selling the goods of that other person while he is really selling his own.

The party injured is protected, not on the ground of the infringement of a trade-mark, for he may be protected in the use of that which is not a trade-mark. Thus: B may be enjoined from running an omnibus having upon it such names, words and devices as to form a colorable imitation of those which had been previously placed on the omnibus of A—(*Knott vs. Morgan*, 2 *Keene*, 213;) or he may be enjoined from using a name for his hotel which had been previously appropriated by A, under which A's hotel had become popular and secured a large custom—(*Howard vs. Henriques*, 3 *Sanfd. S. C.*, 725;) or in the use of a geographical name which he cannot honestly use—(*Lea vs. Wolff*, 15 *Abb. Pr.*, 1; *Wotherspoon vs. Currie*, 22 *L. Times*, *N. S.*, 260; *Browne on Trade-Marks*, sec. 96;) though in all of these cases the name cannot be a trade-mark. His right is to be protected against fraud which entails damage, and fraud may be practiced against him by the imitation of labels and names which cannot be trade-marks,

quite as effectually as by the imitation of trade-marks. *Croft vs. Day,* 7 *Beavan,* 84, 88; *Eddleston vs. Vick,* 18 *Jur.,* 7; *Browne on Trade-Marks, secs.* 537–539; *Burke vs. Cassin,* 45 *California,* 467; *Stonebraker vs. Stonebraker,* 33 *Md.,* 252, 262, 263, 268; *Holloway vs. Holloway,* 13 *Beavan,* 309; *Matsell vs. Flannagan,* 2 *Abb. Pr., (N. S.,)* 459; *Williams vs. Johnson,* 2 *Bos.,* 1; *Blofield vs. Payne,* 4 *B. & Ad.,* 410; *Gillott vs. Esterbrook,* 47 *Barb.,* 455.

A comparison of the two almanacs shows that the appellant has imitated the appellees' almanac in all its essentials, even in the name "Hagerstown Almanack," and that the only substantial difference is that the appellant calls her almanac "T. G. Robertson's Hagerstown Almanack," whilst the appellees' publication is called "J. Gruber's Hagerstown Town and Country Almanack." This imitation is clearly an infringement, and under the allegations of the bill, a fraudulent simulation. *Seixo vs. Provezende,* 1 *Ch. App.,* 196; *Amoskeag Mfg. Co. vs. Spear,* 2 *Sandf. S. C.,* 305; *Boardman vs. Britannia Co.,* 35 *Conn.,* 402; *Millington vs. Fox,* 3 *Mylne & Craig,* 338; *McLean vs. Fleming,* 6 *Otto,* 245–56 and 7; *Eddleston vs. Vick,* 18 *Jur.,* 7; *Lockwood vs. Bostwick, Am. Trade-Mark Cases,* 535–8; *Kerr on Injunctions,* 483, 485.

MILLER, J., delivered the opinion of the Court.

This appeal is from an order granting an injunction restraining the appellant from publishing and circulating a certain almanac for the year 1879, known as "*T. G. Robertson's Hagerstown Almanack,*" with the same emblems, devices, marks, representations, title and back outside pages, style, shape and general appearance as have characterized the publications of the same for previous years, and from printing, publishing and circulating any other almanac in colorable imitation of the almanac of the complainants, known as "*J. Gruber's Hagerstown Town and Country Almanack,*" and calculated to deceive and impose

upon the public, and to create in their minds the belief
that such almanac is really and truly the almanac of the
complainants. In determining whether this order shall
be affirmed or reversed this Court is confined to the case
made by the bill and exhibits, without reference to the
averments of the answer which appears in the record.
*McCann vs. Taylor,* 10 *Md.,* 418.

It is immaterial to the decision of the case, in the view
we have taken of it, whether the devices, marks, pictures
and words, in the manner in which they are collocated
and combined upon the two outside pages of the com-
plainants' almanac, be regarded as a trade-mark proper or
as wrappers or labels, or as the title or the particular exter-
nal marks which an author or publisher affixes to his work
to distinguish it, because the grounds of relief in equity are
substantially the same in either case. A publisher or
author has either in the title of his work or in the appli-
cation of his name to the work, or in the particular marks
which designate it, a species of property similar to that
which a trader has in his trade-mark, and may like a
trader claim the protection of a Court of equity against
such a use or imitation of the name, marks or designa-
tions, as is likely in the opinion of the Court to be a cause
of damage to him in respect of that property. *Kerr on
Injunctions,* 478; *Browne on the Law of Trade-Marks, sec.*
553. This doctrine, in cases where the facts are sufficient
to sustain it, has been held applicable to such periodical
publications as newspapers, magazines, and almanacs.
*Matsell vs. Flannagan,* 2 *Abb. Pr.,* 459; *Hogg vs. Kirby,*
8 *Ves.,* 215; *Spottiswoode vs. Clark,* 10 *Jurist,* 1043. But
here, as in cases of trade-marks proper, the complainants
must show a property right in themselves, and a fraudulent
or colorable imitation by the defendant, and we shall
therefore proceed to consider whether these two essential
requisites to relief in equity are made out by the bill and
exhibits before us.

Robertson *vs.* Berry & Co., *et al.*

1st. And first, assuming the complainants or some of them have established their own right to the symbols, marks and devices, as used on their almanac, has there been such an imitation of them by the defendant on her almanac, as to entitle the former to have the publications by the latter enjoined? Upon the question of resemblance, the authorities all agree that it is impossible to lay down any general rule as to what degree of resemblance is necessary to constitute the fraudulent or colorable imitation. All that can be done is to ascertain in every case as it occurs whether there is such a resemblance as that ordinary purchasers purchasing with ordinary caution are likely to be misled. *Kerr on Injunctions,* 483 ; *McLean vs. Fleming;* 6 *Otto,* 245. In the case last cited there is a very complete review of the authorities, and the Court says, that "much must depend in every case upon the appearance and special characteristics of the entire device ; but it is safe to declare, as a general rule, that exact similitude is not required to constitute an infringement or to entitle the complaining party to protection. If the form, marks, contents, words, or the special arrangement of the same, or the general appearance of the alleged infringer's device is such as would be likely to mislead one in the ordinary course of purchasing the goods, and induce him to suppose that he was purchasing the genuine article, then the similitude is such as entitles the injured party to equitable protection, if he takes seasonable measures to assert his rights and to prevent their continued invasion." In the case of *Seixo vs. Provezende, Law,* 1 *Ch. Appeals,* 192, *Lord* CHANCELLOR CRANWORTH expresses substantially the same views thus: "what degree of resemblance is necessary from the nature of things, is a matter incapable of definition *a priori.* All that Courts of justice can do is to say that no trader can adopt a trade-mark so resembling that of a rival as that ordinary purchasers purchasing with ordinary caution are likely to be misled. It

would be a mistake, however, to suppose that the resemblance must be such as would deceive persons who should see the two marks placed side by side. The rule so restricted would be of no practical use. If a purchaser looking at the article offered him would naturally be led, from the mark impressed on it, to suppose it to be the production of a rival manufacturer, and would purchase it in that belief, the Court considers the use of such a mark to be fraudulent." Among other authorities to the same effect, and as having an important bearing upon the case before us, we refer to *Holloway vs. Holloway,* 13 *Beav.,* 209; *Amoskeag Manufg. Co. vs. Spear,* 2 *Sandf.,* 599; *Swift vs. Day,* 4 *Robertson's Sup. Ct.,* 611; *Williams vs. Johnson,* 2 *Bostworth,* 1; *Lea vs. Wolff,* 15 *Abb. Pr.,* (*new series,*) 1; *Gillott vs. Esterbrook,* 47 *Barb.,* 455; *Burke vs. Cassin,* 45 *Cal.,* 467; *Boardman vs. Meriden Britannia Co.,* 35 *Conn.,* 402; *Howard vs. Henriques,* 3 *Sandf.,* 725; *Knott vs. Morgan,* 2 *Keen,* 213; *Perry vs. Truefitt,* 6 *Beav.,* 66; *Croft vs. Day,* 7 *Beav.,* 84; *Wotherspoon vs. Currie,* 22 *Law Times,* (*new series,*) 260; and *Canal Co. vs. Clark,* 13 *Wallace,* 322. In the present case we are clearly of opinion, the imitation is such as is well calculated to mislead ordinary persons purchasing with ordinary care. It is unnecessary, even if it were practicable, to present a detailed description in words, showing the resemblance of the first or title pages of these two almanacs, as it appears to the eye. It is plain enough to the eye of the observer, but difficult to be described. There is a difference in the names and in some of the words used, and there are several marks of distinction in the symbols or pictures and the border enclosing them, which a careful inspection soon discloses, but there is exact similitude in the color, size, shape, and, in the different type in which the more and less prominent words and figures are printed, as well as in the paper and binding of each. These make the resemblance at first sight quite sufficient to deceive the " ordinary run of per-

sons," even if the two were lying side by side on the counter of a book-store, or in a newspaper stall, while the back outside pages of each are in every respect identical. This part of the complainants' case is, in our opinion, clearly made out.

2nd. As to the property right. On this subject the authorities all declare that the right of property in the plaintiff must be clearly shown. *Witthaus vs. Mattfeldt & Co.,* 44 *Md.,* 303. From the averments of the bill, to which we are confined, it appears that about the year 1835, John Gruber, the ancestor of some of the complainants, commenced the publication of an almanac to which he gave the name of "J. Gruber's Hagerstown Town and Country Almanack," and for the purpose of distinguishing it from all other publications of almanacs he adopted and made use of certain devices, emblems, representations, marks and pictures, which he combined and collocated in a manner entirely new and original, and these are the same as those now used on the almanac of the complainants. He continued this publication annually from 1835 to his death in 1858, and by his skill in the order and arrangement of the calendar, and the variety of the miscellaneous matter inserted therein, he acquired the good-will of the public and a large circulation for his almanac, and it was a source of profit and revenue to him during his life-time, and the emblems and devices before described became identified with his said publication and were the means by which it was known and distinguished by the trade. This, according to the averments of the bill, was the *origin* of the emblems and devices in which the complainants now claim a property right. In our opinion that right does not depend upon the derivation of a *legal title* from John Gruber, either through his will, or by the administration *de bonis non c. t. a.,* taken out long after his death, for the purpose of obtaining title to, and distributing, as *assets* of his estate, these alleged *trade-marks*

and the *good-will* of this printed publication, and we there-
fore dismiss from consideration all the averments of the
bill on this subject. But it seems to us that the claim
and right can be well tested upon another ground. The
bill shows that in 1854, Gruber being then aged and in-
firm and unable to perform the manual labor for the
printing and issuing of the almanac continued its publi-
cation through the agency of William Stewart and Thomas
G. Robertson, by a letter of license and authority to them
which was printed on the second page of each issue. For
many years prior to his death and before this agency of
Stewart and Robertson, the surviving members of his
family had contributed their labor in the publishing and
preparation of these almanacs for the market. After his
death his widow and executrix continued the annual pub-
lication *during her life* on account of herself and the other
surviving members of the family, and did so through the
business management of Robertson, notice of which was
printed on each number, and during her life it was a
source of revenue to her and her family and was their
only means of support. The widow died in 1866, and
the annual publication was continued by the family also
under the business management of Robertson, notice of
which was also printed in each number. In 1874, one of the
daughters died, after which two other daughters, for the
use of themselves and the surviving members of the
family of John Gruber, continued the publication and are
now by their assignees, (who are also complainants,)
printing and publishing this almanac. During all this
period from the death of Gruber, nearly twenty years, the
publication was continued in his name and two of his
daughters sue in this case as co-partners trading under
the name and style of "J. Gruber." It was so continued
and is now annually published by the complainants in
the same style, with the same emblems, pictures and de-
vices, with the same title-pages, distribution and arrange-

ment of matter which had distinguished it during the life of Gruber. His family by the manner in which they have conducted the publication have retained the good-will of the public, increased its circulation, and at the present time under their management and that of their assignees and agents its circulation is extensive, and the good-will attendant upon it valuable, and since Gruber's death it has always been and is now known to the trade and public generally by the same emblems, devices, marks and representations before stated. The sole and exclusive right of Gruber's family so to publish and sell this almanac was acknowledged and acquiesced in by all persons, and especially by Robertson, the husband of the defendant, who was the agent of Gruber and his family, as before stated, and afterwards by his widow, the defendant; for upon Robertson's death in 1869, his executors contracted with the members of the Gruber family for its publication for the period of five years, and the latter authorized and permitted the executors to publish it for that time, and they did so up to the year 1875, and during this period Mrs. Robertson and her children received all the revenues and profits arising from its sale, except the sum of $450 per annum which was paid to the family of Gruber as a royalty for the license so to print and publish. After this and during the years 1876, 1877 and 1878, Mrs. Robertson commenced and continued the publication of her almanac, which the bill charges to be a fraudulent imitation of that of the complainants. Without noticing at length many other allegations of the bill, the facts thus stated show that the complainants have acquired a property right in the devices, emblems and title-pages in question by adoption and user. That such right may be so acquired appears to be well established by authority. Thus in *Eddleston vs. Vick*, 18 *Jurist*, 8, it was held and expressly decided by the Vice Chancellor, Sir W. Page Wood, that the right of property in certain labels

or engraved papers or wrappers in which pins manufactured by the plaintiff were put up, could be acquired by user alone. "If," says his lordship, "the plaintiff or those under whom he claims, has used this label continuously for a certain space of time, that is enough to enable him to prevent others from using it and making a profit out of the reputation which that label has acquired in the market." The plaintiff in that case was not the original inventor or proprietor of the labels or engraved papers or wrappers, but claimed from the assignees in bankruptcy of a former partner of the original proprietor and inventor. He had, however, carried on the business and used the labels for a period of more than eleven years, and by this alone he was held to have acquired a right of property in them. So in *Canal Company vs. Clark*, 13 *Wallace*, 322, the Supreme Court say: "Undoubtedly words, or devices may be adopted as trade-marks, which are not original inventions of him who adopts them, and Courts of Equity will protect him against any fraudulent appropriation or imitation of them by others." In such cases the adoption and use must be under such circumstances of good faith, as to satisfy the Court that the plaintiff is not himself practicing a fraud upon the public. He must explain how he came to such adoption and use, or in other words, he must come into Court with clean hands. It seems to us very clear that such explanation is abundantly given by the bill in this case, and the adoption and user thus made out entitle the complainants to the injunction prayed for. It is scarcely necessary to add, that a Court of Equity interferes in such cases to prevent fraud, and this is the broad ground upon which its jurisdiction rests.

3rd. It was suggested and contended in argument, that the averment that the complainants *are credibly informed and verily believe, and therefore charge,* that the defendant has printed, published and issued, or caused to be printed, published and issued, within the last few days, an edition

Robertson *vs.* Berry & Co., *et al.*

of her almanac for the year 1879, in the same fraudulent and colorable imitation of that of the complainants, is not sufficient to justify the granting of the injunction.  But without stopping to inquire whether this averment by itself would be sufficient, we find referred to in the bill, and filed as an exhibit with it, a copy or number of the defendant's almanac for the year 1879 exhibiting precisely the same appearance and characteristics as those of the two previous years, and equally resembling that of the complainants.  This is quite sufficient to satisfy the Court upon the point suggested.

The order appealed from will therefore be affirmed; and in so doing we must be understood as intimating no opinion upon any other question than the one directly before us, *viz.*, that the averments of the bill are sufficient to justify the granting of the injunction prayed for.

*Order affirmed, and*
*cause remanded.*

(Decided 28th February, 1879.)