# CIRCUIT COURT OF BALTIMORE CITY

Filed December 26, 1888.

## GILLETT VS. KENNY.

*Goodwin & Culbreth* for plaintiff.

*Charles Marshall* and *McColgan & Taaffe* for defendant.

(See Appeal 70 Md. 574-R.)

DENNIS, J.—

The bill alleges that the firm of Martin Gillet & Co., the plaintiffs, having been in business in Baltimore City since 1811, as buyers and sellers of teas, placed upon the market in 1875 a superior quality of tea, which they called "He-No"; that this word was their own invention, and while a meaningless symbol, had been exclusively used by them, and was in the same year duly registered as a trademark in the office of the Commissioner of Patents; that in order to still further distinguish their preparation of tea from that of others, they adopted certain *indicia* in connection with said name, whereby the tea prepared and sold by them became well known and generally recognized—these *indicia* consisting of the shape of the packages in which it was put up, the style and coloring of the lettering and of the other marks and labels upon the packages, a new method of fastening the same, and certain Chinese characters around the top and bottom thereof, which translated into English mean "Martin Gillet & Co.'s Genuine He-No Tea." The bill then alleges an infringement of the plaintiffs' trade-mark by the defendant in numerous particulars in the use of a package in which the defendant sells what he calls his "Hi-Hi" Tea; prays for an account, and an injunction to prevent further infringement by the defendant.

In his answer the defendant does not deny the plaintiffs' right to his alleged trade-mark, but denies its infringement by the defendant, and enumerates several points of difference between the two packages; and in an amended answer he alleges that certain representations upon the plaintiffs' package are false and fraudulent and intended to deceive the public, and hence the plaintiffs are not in a position to ask relief in a Court of equity.

To entitle the plaintiffs to the relief asked they must show: First, title to their trade-mark; second, its infringement by the defendant, and third, that the allegations of fraud set up by defendant are unfounded.

As to the first, the title of the plaintiffs to the trade-mark claimed in their bill is not seriously disputed. In any event their right to it is conclusively established by the evidence.

Second. The law in regard to what constitutes an infringement of a trademark is fully and clearly stated by our own Court of Appeals. It says: "It is impossible to lay down any general rule as to what degree of resemblance is necessary to constitute the colorable or fraudulent imitation. If the form, marks, words, or the special arrangement of the same, or the general appearance of the alleged infringer's device, is such as would be likely to mislead one in the ordinary course of purchasing the goods, and to induce him to suppose he was purchasing the genuine article, then the similitude is such as entitles the injured party to equitable protection, if he takes reasonable measures to assert his rights and to prevent their continued invasion. It would be a mistake to suppose the resemblance must be such as would deceive persons who should see the two marks placed side by side. The rule so restricted would be of no particular use."

Applying this rule to the present case, we have experts like Messrs. Lawson, Reese, Edmonds and Stabler, certainly among the most prominent dealers in teas in this city for the last twenty to thirty years, testifying, without any doubt or hesitation, that the similarity between the plaintiffs' and defendant's packages is such as would deceive an ordinary purchaser purchasing with ordinary caution. Mr. Edmonds himself was somewhat at a loss at first to point out the differences between them when actually before him and in his hands; and, while manifestly a most impartial witness he testified that "on a Saturday night" he

could easily put off the defendant's package as being the plaintiffs' goods upon a majority of his customers if he chose to do so.

But in cases like this we are not compelled to resort to the testimony of experts. The Court is entitled, by an inspection of the exhibits, to form its own opinion of the degree of similarity between them, and whether, therefore, there has been any infringement; and in this case, while (in the language of the Court of Appeals in Robertson vs. Berry, 50 Md. 597), "It is unnecessary, even it were practicable, to present a detailed description in words, showing the resemblance * * * as it appear to the eye" between the packages containing the plaintiffs' "He-No Tea" and the defendants' "Hi-Hi Tea," the Court entertains no doubt whatever of the simulation, and the fraudulent simulation, by the defendant of the plaintiffs' goods. This simulation appears in the shape of the packages, the mode of fastening, their dimensions in respect to length and breadth, the character of paper used, the coloring of the inscriptions and marks, the character of the letters and their size, the bands at the top and bottom of each package, the purport of the several inscriptions and their position with reference to each other, and in the general appearance of the package. Certain differences between the inscriptions on the packages do exist; but they are for the most part minor and trivial; and those which are most pronounced, and hence most calculated to strike the eye of the purchaser, are upon the bottom and reverse side of the packages, and where consequently they are less likely to be observed, considering the manner in which such packages are, as is shown by the testimony, usually stacked when exposed for sale at retail.

In further confirmation of the fraudulent intent of the defendant in this simulation of the plaintiffs' trademark is shown the fact that some years ago the defendant was openly using the plaintiffs' trade-mark of "He-No Tea," but at that time without using his name over his own goods, and was only restrained in his piracy by an injunction from this Court.

But wholly conclusive proof of his fraudulent simulation of the packages of the plaintiff now in question is shown by the following testimony of his own witnesses.

The defendant testifies that when he first ordered his packages to be made he gave special directions that they should be *unlike those of the plaintiffs'*. The result of this special instruction was, however, packages *so exactly like those of the plaintiff* that the defendant himself testifies he rejected them because of the *similarity!* This looks as if the agent knew in what direction, at least, his principal was aiming. After the rejection of this first lot by reason of *undue* similarity, a new lot was ordered by the defendant, under fresh instructions from him; and this new lot was accepted by him, and are those he is now using, and which we have been considering. Now, around the tops and bottoms of the plaintiffs' packages are sixteen Chinese characters, which had been obtained several years ago from a Chinese scholar, Dr. Houston, at that time secretary of the Chinese embassy at Washington, and which meant, when translated into English, "Martin Gillet & Co.'s Genuine He-No Tea." In these new packages made for the defendant under his instructions, and approved and now in use by him, in addition to the numerous points of resemblance already adverted to, there are similarly placed around their tops and bottoms sixteen characters, which appear to be Chinese symbols; and of that number twelve are *genuine* Chinese symbols, every one of which appears in the sixteen appearing on the plaintiffs' packages, and which mean "Martin Gillet & Co.'s Genuine He-No Tea," and the other four, which do not appear upon the plaintiffs' packages, are shown *not to be Chinese characters at all*, but are *utterly meaningless designs*. The designer (Oliver) swears that at the time he made those packages for the defendant, he had never seen those of the plaintiffs'; and the only explanation that is offered for this extraordinary coincidence in these symbols found upon the plaintiffs' packages and those appearing upon those of the defendants', and which were prepared under the revised instructions of the defendant himself, is, that the designer got his design from *Chinese Laundry Tickets*, which he had brought with him *some time ago from Chicago!* When we reflect that, according to the testimony, there

are at least seven thousand Chinese characters, from which the designer could have made his selections, and only a few of which it is fair to presume were required in the vocabulary of a Chinese laundry, the selection by him *from this source*, of twelve out of the sixteen characters used by the plaintiffs on their packages, which packages he swears he had never seen, cannot be explained upon the theory of accident or coincidence; the testimony of this witness (Oliver) is simply perjury—as gross as the fraud it seeks to support. It may be that the defendant was not aware of the exact imitations of the symbols on the plaintiffs' bags; but it is evident he had been conducting his business with reference to that of the plaintiffs' since his first use of their name—He-No—for their tea; and that these packages, prepared under his repeated instructions, were intended by him to be just as close in their resemblance to those of the plaintiffs' as he thought he could safely go.

Third. As to the standing of the plaintiffs to have the relief asked.

The first answer of the defendant made no suggestion of this defense; it simply denied any infringement of the plaintiffs' trade-mark, and pointed out the several points of difference. But their amended answer distinctly charges false representations in the inscriptions upon the plaintiffs' packages, which are calculated to deceive the public; and that therefore the plaintiffs do not come into Court with clean hands.

These alleged false representations consist of certain labels appearing upon different parts of the plaintiffs' packages, viz: "He-No Tea," "Martin Gillet & Co., Importers," and "The kind the Chinese drink"; and the defendant says, to quote from his solicitor's brief, "to every rational person the representations upon the packages must mean, first, that there is a tea in China known there as 'He-No'; second, that the plaintiffs import that particular tea and sell it here, and third, that 'He-No Tea,' as 'He-No,' is drunk by the Chinese. That is what the public must necessarily believe from seeing the plaintiffs' packages." So far as the evidence shows, there is no tea in China known as "He-No." The plaintiffs prove that the word is a wholly meaningless one, adopted by

them in 1875, as their trade-mark, the fact and date of the trade-mark being given on their packages. They say the tea is a mixture of three kinds of teas, viz: Foo Chow Oolong, Formosa Oolong and Young Hyson teas, which mixture is made by themselves, in their own warehouse, according to a secret formula, by which they get the desired flavor and appearance, and after being subjected to a secret process, by which it is rid of certain impurities and other foreign substances which all teas imported for the American market contain. Teas prepared in China for the American market are said to be variously manipulated, so as to give them what is termed in the trade "style"; as, for instance, being made round and attractive to the sight, or rolled into other conventional forms, or given a certain color, &c. During these processes of manipulation in China great impurities are said to get into these teas, of all of which impurities, artificial shapes, &c., the plaintiffs, by their secret processes, rid the several teas, out of which their "He-No" is compounded, before they are mixed into the tea under that name. They exhibited samples of these impurities at the hearing which were of the most disgusting character. It is further shown that the Chinese themselves do not drink teas, which have been thus manipulated and rendered liable to these impurities; and the plaintiffs testify that it was to give the public a tea which they would guarantee was tea, free from these impurities, that they devised the processes by which their "He-No" is made rid of them, and which they are enabled to guarantee as "pure and unadulterated," and that it was in this sense they used the words "The kind the Chinese drink," in contradistinction to the kinds that are prepared for the foreign market. The testimony further shows that all the teas out of which the "He-No" is compounded are imported by the plaintiffs themselves from the place of growth. Of course it is not imported as "He-No," because there is no such brand in China. This importation was made in two ways: one is by the plaintiffs sending their orders directly to a Chinese house, such as Russell & Co., who have branch houses in all the ports of China, and similar firms; and the other is by send-

ing the order to agents of the Chinese house in New York, in which latter case, however, the goods are shipped directly to the plaintiffs' own warehouse in Baltimore, and do not go to the agents' warehouse in New York at all; and the plaintiffs' ownership in the goods thus imported attaches from the date of the broker's contract. They are as fully imported, therefore, by the plaintiffs as if the latter had purchased them in person in China.

Under this state of the facts, which are not disputed, do the several inscriptions upon the plaintiffs' packages which have been referred to, constitute such misrepresentation, and deceits upon the public, as will preclude the plaintiffs from the relief to which they would otherwise be entitled? The Court thinks not. Considering each inscription singly, they are strictly true. The term "He-No" does not mean or even simply imply, that there is such a brand in use in China; the plaintiffs *are* importers; and the expression—"the kind the Chinese use" is true, as respects the main consideration, which is, that it is a pure and unadulterated tea, such as the Chinese use, and not the kind that is used in this country. Taking all the expressions together, and aiding each by such inferences as can be drawn from the other, they do not, even in that case, necessarily prove the fraudulent meaning which the defendant would ascribe to them. They are substantially true, in a fairly reasonable sense, without any strained construction. Certainly the public is not harmfully misled by them, as it gets a pure and unadulterated tea; and even if the question was doubtful, the Court would be reluctant to give the benefit of the doubt in favor of a defendant who has so *clearly* and *deliberately* undertaken to deceive the public, and to appropriate to himself the result of another's labor.