PILLSBURY–WASHBURN FLOUR MILLS CO., Limited, et al.· v. EAGLE.

(Circuit Court of Appeals, Seventh Circuit. April 5, 1898.)

No. 462.

1. TRADE-MARK—FRAUDULENT COMPETITION—EQUITY JURISDICTION.

Where one person has so dressed out his goods as to deceive the public into the belief that they are the goods of another person, and so put them upon the market to the manifest injury of that person and of the public, an action at law will lie for the deceit; and, to save a multiplicity of suits, and prevent irreparable injury, equity will restrain such unfair and fraudulent competition.

2. SAME—GEOGRAPHICAL NAMES.

While a geographical name is not the subject of a trade-mark, and any one may use it, yet where it has been adopted, first, as merely indicating the place of manufacture, and afterwards has become a well-known sign and synonym for superior excellence, persons residing at other places will not be permitted to use it as a brand or label for similar goods for the purpose of appropriating the good will and business of another.

3. SAME—PROPRIETARY RIGHT.

Where the question is simply one of unfair competition, it is not essential that there should be any exclusive or proprietary right in the words or labels used, as, irrespective of any question of trade-marks, rival manufacturers have no right, by imitative devices, to beguile the public into buying their wares under the impression they are buying those of their rivals.

4. SAME—JOINDER OF PARTIES.

Where one person or corporation is entitled to relief in a case of fraudulent competition in trade, two or more persons or corporations having a common interest in preventing the fraud may unite to maintain an action in equity.

5. SAME—MINNEAPOLIS FLOUR MANUFACTURERS.

Certain millers in Minneapolis, Minn., and their predecessors in business have for 30 years made flour by the roller patent process, and used as brands the words "Minneapolis," "Minneapolis, Minn.," "Minneapolis, Minnesota," "Minnesota," "Minnesota Patent." The words "Minnesota" or "Minnesota Patent" mean that the flour is made under the roller patent process somewhere in Minnesota. The words "Minneapolis," "Minneapolis, Minn.," "Minneapolis, Minnesota," signify to the trade that the flour was made at a Minneapolis flouring mill. A dealer in Chicago, Ill., obtains from mills at Milwaukee, Wis., an inferior grade of flour, which he labels "Best Minnesota Patent, Minneapolis, Minn.," and advertises as made at Minneapolis, Minn., with the result that the public is deceived into buying this flour under the belief that it is made at Minneapolis, and is defrauded, and the business of the Minneapolis millers is damaged. *Held*, that a court of equity may grant relief by prohibiting the fraud and preventing damage to the business of the Minneapolis millers. 82 Fed. 816, reversed.

6. SAME.

The fact that one of the mills belonging to one of the Minneapolis millers is situated 10 miles from the city is not important when it is shown that such mill is an integral part of a Minneapolis milling plant, has the same machinery, is run in the same manner, grinds the same grade of wheat, and has always been considered as one of the Minneapolis mills.

7. SAME.

Such objection, if important, should be taken by plea in abatement for the misjoinder of parties, and furnishes no good ground for not granting relief as to other complainants.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

Frank F. Reed, for appellants.

Edward O. Brown, for appellee.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge. This suit is brought by the complainants, who, for many years, have been engaged in the manufacture of flour on a large scale at the city of Minneapolis, Minn., against the defendants, who are engaged as wholesale and retail grocers in the sale of flour at Chicago, Ill., to enjoin the defendants from using as a part of their brand placed upon their barrels and sacks containing flour the words "Minnesota Patent," or "Minneapolis, Minnesota," or "Minneapolis, Minn." The allegations of the complainants' bill, which are fully sustained by the evidence, are substantially these: The complainants are corporations, all, except one, organized under the laws of Minnesota. The Pillsbury-Washburn Flour Mills Company, Limited, is a corporation organized under the laws of Great Britain. These seven corporations separately own and operate, and have for many years, flouring mills situated in Minneapolis, numbering in all at the present time some 22 or 23 mills. The first mill was built in 1859, when the city had a population of less than 6,000 inhabitants. Since then the growth of the milling interest has kept pace with that of the city, so that, while the population of the city in 1896 was about 200,000, the product of the mills was 60,000 barrels per day, or some 13,000,000 barrels per year. The Pillsbury-Washburn Company alone own and operate five mills, with a daily capacity of 25,000 barrels ground, packed, and put up ready for shipment, and with an annual output of about 4,600,000 barrels of flour. These mills all use in their manufacture only the highest grade of hard spring wheat grown in Minnesota and the Dakotas, and for the purpose of storing and handling the wheat own and operate many hundreds of elevators in Minneapolis and other parts of Minnesota and the Dakotas. They early adopted and employed the process of high grinding, and subsequently the roller grinding or Hungarian patent process, which is especially adapted to hard wheat. By this roller patent process, which is a development and extension of the high grinding process with improved machinery, the wheat is subjected to the operation of successive graduated rollers whereby the external portion, the wheat kernels are disintegrated, removed, and successively carried away, so as to leave the interior or core of the wheat containing the nutritive gluten for disintegration separately and last, the process being to first remove by the action of the rollers the outside hull of the wheat, and then the starchy portions, thus preserving as nearly as possible the gluten for separate grinding, in this way obtaining a wheat flour which is from 40 to 50 per cent. of gluten and the balance starch, and which is known as "Patent" or "Patent Process" flour, and is highly nutritious, and makes a fine white quality of bread, the flour commanding the highest price in the market. That the different operators and owners have used upon the sacks and barrels containing the flour manufactured at their respective mills various trade-marks and brands of two distinct kinds known as "mill brands" and "customers' brands," the latter being subdivided

into foreign and domestic. Mill brands consist of names, marks, and symbols peculiarly arranged, indicating by assertion or association the mill, establishment, or combination of mills producing the flour contained in the receptacle exhibiting and employing such brands. Customers' brands consist of names, marks, and symbols peculiarly arranged, and put on the flour receptacles, indicating sometimes by statement and implication and sometimes by association the flour jobber, wholesale or retail merchant, selecting and standing sponsor for the flour in the exhibiting sack or barrel, and frequently simply the place of manufacture, as being "Minneapolis, Minn." Nothing resulting from use, exploitation, association, or otherwise was, as a rule, used to identify the flour sold under these customers' brands as the product of any particular mill or mills; but the place of manufacture of the flour was usually indicated. The flour jobber or wholesale or retail merchant who exploits, introduces, and owns the brand, may, with perfect propriety, and frequently does, secure the flour for his particular brand from different mills operated by different persons. As a matter of fact, however, almost all the brands of flour, both mill and customers', used and employed at any time upon flour made at any of complainants' mills, have contained and distinctly and prominently exhibited thereon the words "Minneapolis," "Minneapolis, Minn.," or "Minneapolis, Minnesota." Many of said brands have also contained the words "Minnesota" or "Minnesota Patent" in addition to the word "Minneapolis," and a few brands have omitted the word "Minneapolis," and employed the words "Minnesota" or "Minnesota Patent" instead. The use of these last-named words, "Minnesota" or "Minnesota Patent," means, and is understood by the trade, buyers, and consumers to mean, that the flour in the receptacle exhibiting them is made under the patent process as above described somewhere in the state of Minnesota. The words "Minneapolis," "Minneapolis, Minn.," or "Minneapolis, Minnesota," in flour brands signify universally to jobbers, wholesale, and retail merchants, flour traders and dealers, buyers and consumers that the flour in the receptacle imprinted therewith was made at a Minneapolis flouring mill, and, because of the location, methods, and reputation of Minneapolis, that the flour is "Minnesota Patent" flour made at "Minneapolis, Minnesota." That the location of the said city of Minneapolis upon the Mississippi river is highly advantageous and desirable for flour milling. The states of Minnesota and North and South Dakota produce the highest grades and best qualities of hard spring wheat in enormous quantities, and the immense acreage therein devoted to this product is strong assurance that there will at all times be an ample wheat crop for supplying the Minneapolis mills, while the capital invested and population interested and employed in this hard spring wheat growing industry, and the adaptation of soil and climate to the production of such wheat, insure competition, and the progressive development of the industry, increase in production, and improvement in quality. Minneapolis is situate at the extreme southeast of this hard wheat region, and is a natural outlet of the wheat grown therein for shipment, either as grain or flour, through-

out the United States, and especially to the manufacturing populations in the Central and Eastern states, where the consumption of hard spring wheat flour is extensive, and to the seaport cities for export. Principally because of the grain and flour trade, Minneapolis has become both a terminal point for many important railroads which concentrate there from points throughout the hard wheat growing district, and the initial point of many trunk lines terminating at points along the Great Lakes and in the Central, Southern, and Eastern states and seaports. The locality and the fine water power induced the establishment of mills at Minneapolis early in the development of the country northwest thereof, and from 1859 until the present the growth of the flour industry there has been constant and rapid. This industry has always been the leading one of Minneapolis, and through it the place has in 37 years increased in population from less than 6,000 to about 200,000 inhabitants. Over 5,000 men find work in and about the flour mills and business, and as many more in connection with buying, selling, storing, and handling grain. Minneapolis has long been styled throughout the United States and also abroad the "Flour City." From the inception of the flour-milling business there in 1859, there has been among and between all the mills located there the keenest competition as to quality and quantity of flour made and sold, and early in the history of the milling industry at Minneapolis there was adopted the custom between millers of frequently examining and comparing the methods and machinery employed in the various mills, and of frequently examining and comparing the flour produced. All wheat used at the Minneapolis mills has for years been systematically inspected and graded by competent and disinterested persons appointed for that purpose by the state of Minnesota. The machinery in the mills is made almost entirely by two establishments. This comparison of mill products by the mill owners and operators has been made daily for over 12 years. Each day each mill submits to an expert two pounds of its high-grade flour, who examines, tests, and bakes it, and reports the result. These methods, and the close proximity of the mills, produce the greatest uniformity and identity in the flour made at the mills. Practically these mills have always been run on the same systems and methods, and with exactly similar machinery and appliances, employing the same grades of hard spring wheat grown in the same territory, and subjecting it to the same kind of inspection, and, as the necessary consequence, the flour ground at all the mills has been practically of the same classes, kinds, qualities, and reputations. As a result of this method and the continued and extended use of the words "Minneapolis." "Minneapolis, Minn.," and "Minneapolis, Minnesota," in and upon the brands, both mill and customers', and in advertisements, circulars, and announcements relating to the flour and brands, there has grown up, and for a long time has existed, and now exists, throughout the United States and in many foreign countries, a great reputation and demand for flour made in Minneapolis, Minn., and the flour made at the mills of complainants is known generally as "Minnesota Patent" flour, and also especially as "Min-

neapolis Flour," and is classified and listed upon markets, and is in both the trade among flour dealers, wholesale and retail, and wholesale and retail grocers, and by purchasers and consumers, asked for, identified, bought, and sold by the style of "Minneapolis Flour" as a particular and superior kind or grade of "Minnesota" or "Minnesota Patent" flour, and thus the words "Minneapolis," "Minneapolis, Minn.," or "Minneapolis, Minnesota," upon or in connection with flour, signify to and are understood by traders, purchasers, consumers, and the public generally to mean that the said flour was made and put up at some one of complainants' mills, and have acquired and do possess this secondary meaning and significance in the trade.

The complainants and their predecessors in business in the operation of said mills have sold and do sell in Chicago large quantities of flour bearing said trade-marks and names, and there known and dealt in both at wholesale and retail as "Minnesota Patent" flour and "Minneapolis" flour, and by the latter term identified as coming from some one of complainants' mills. The use of the words "Minnesota," "Minnesota Patent," "Minneapolis," "Minneapolis, Minn.," and "Minneapolis, Minnesota" upon, in, and in connection with such flour brands, both mill and customers', employed in connection with flour made at complainants' mills, has caused such brands of flour to become known upon the market, and to be listed, tabulated, and classified as that variety of Minnesota patent flour manufactured at Minneapolis; that is, flour coming from the complainants' mills is styled in common with all other flour made in the state of Minnesota under the roller process, "Minnesota" and "Minnesota Patent" flour, and also more exclusively "Minneapolis" flour. The term "Minneapolis" alone upon flour thus means and is understood by the public to mean "Minnesota Patent" flour manufactured and put up at some one of complainants' mills at Minneapolis, in that state. That the defendants are doing a retail and wholesale grocery business at Nos. 68 and 70 Wabash avenue, Chicago, and as a part of such business deal in and sell flour at wholesale and retail. That prior to 1893 defendants adopted as a trademark for flour put up and packed for and sold by them the brand "H. R. Eagle & Co.'s Best Minnesota Patent, Minneapolis, Minn." That the words "Minnesota Patent, Minneapolis, Minn." were added because of the reputation of that city and state for superior flour, and that the method employed by defendants at the outset was to procure flour at the mills of complainants to be packed in sacks or barrels, and stenciled or marked with such brand, and then shipped and delivered to defendants at Chicago. That such flour was genuine Minneapolis flour, and properly and truthfully labeled "Minnesota Patent, Minneapolis, Minn." That a high and uniform grade of flour was furnished and put up under said brand and sold by the defendants, and thereby and by reason of the reputation of Minnesota patent flour made at Minneapolis, Minn., soon acquired a reputation and demand upon the market. Thereupon, about 1893, defendants, in order to take and continue the advantage of the representation that the flour was Minnesota flour made at Minneapolis,

Minn., and at the same time to procure inferior flour at a less price, and palm and foist off the same upon the public and purchasers and consumers as genuine "Minnesota patent" flour made at Minneapolis, Minn., ceased to obtain the flour sold under said name and brand at mills in Minneapolis, Minn., and have since procured all, or the greater portion, of the flour put up and sold under said brand and name from various flour mills at Milwaukee, Wis.; first from the mills known as the "Phœnix Mill," and then since, and at the present time, from the mills in Milwaukee, Wis., operated by J. B. A. Kern & Sons, and known as the "Eagle Mills." This flour is made from wheat of a different grade, and in an entirely different locality, by flour mills conducted and operated in methods variant from the mills in Minneapolis, and often contains a large percentage of winter wheat, and is in quality, reputation, and value inferior to the genuine "Minnesota Patent, Minneapolis, Minn." flour, and is worth and commands a less price upon the market when truthfully and honestly sold as Milwaukee flour. Nevertheless, the said defendants have made no alteration in the style of their brand used upon Milwaukee flour, but have the same packed at the Eagle Mills in Milwaukee, Wis., and there branded "H. R. Eagle & Co.'s Best Minnesota Patent, Minneapolis, Minn.," and so shipped and delivered to defendants at Chicago, Ill. Such spurious and falsely branded flour is then, with full knowledge on their part of the fraud, advertised and sold by said defendants as and for genuine "Minnesota Patent, Minneapolis, Minn." flour in sacks and barrels containing and conspicuously exhibiting the words "Minnesota Patent, Minneapolis, Minn.," and with the positive assurance, both in advertisements, circulars, and oral representations, that the flour is made in Minnesota, and at Minneapolis. The consequence of this false branding, advertisement, and assertion by the defendants is that inferior flour, manufactured at a locality concealed from, and not desired by, the purchaser, is fraudulently and deliberately palmed off upon the deceived public and purchasers for another and higher priced and more reputable flour, and the public is thereby cheated and defrauded, and complainants are injured by being deprived of a regular, established, and valuable trade, and also by having an inferior flour represented and sold as and for flour made by complainants, and originating at the city to which complainants, by their joint efforts and methods, have given a valuable reputation for flour, which inflicts direct and irreparable injury upon the reputation of complainants' flour, and injuriously affects the trade therein and the demand therefor. The defendants' dealings in such inferior, spurious flour so branded as genuine "Minnesota Patent, Minneapolis, Minn." flour are extensive, and the sales thereof amount to about 4 car loads, or 500 barrels, of flour a week. It is principally by means of a false statement upon the barrels and sacks, "Minnesota Patent, Minneapolis. Minn.," and the reproduction of this statement and fac simile of the brand in advertisements, that the belief is induced on the part of buyers that the flour is "Minnesota Patent, Minneapolis, Minn." flour. The milling establishment of J. B. A. Kern & Sons carefully conceals the fact that this flour so branded

is ground, packed, and shipped by it under such brand and names, and H. R. Eagle & Co. also carefully hide the truth, and persistently assert to buyers that the flour is made in Minneapolis, Minn., and the result is benefit to J. B. A. Kern & Sons and H. R. Eagle & Co., and injury to the public and to complainants.

The defendant H. R. Eagle alone appears, and denies that he has any knowledge of any such person as Wallace R. Eagle, and the principal issue tendered by defendant's answer relates to the signification of the terms "Minnesota Patent," "Minneapolis, Minnesota," or "Minneapolis, Minn.," as used by the complainants and by him upon their flour sacks and barrels, the defendant denying that these words so used have the meaning ascribed to them by the complainants, or that they are understood by traders, purchasers, consumers, and the public generally to mean that the flour is made and put up at the mills of the complainants, or that the words "Minnesota" or "Minnesota Patent," used in connection with flour, are understood by dealers in flour, or purchasers and consumers, or by the public generally, to denote that the flour was ground in the state of Minnesota; and denies that the complainants have any exclusive right to the use of the words "Minneapolis," "Minneapolis, Minn.," or "Minneapolis, Minnesota"; but, on the contrary, alleges that the word "Minneapolis" is and has been generally used and understood to designate flour manufactured by the patent, or roller, or Hungarian process, from the fact that the use of that process in the manufacture of flour first became generally known in the United States in connection with the city of Minneapolis, having been there first introduced. The defendant asks the court to take notice that by the admission of the bill of complaint, one of the complainants, the Pillsbury-Washburn Flour Mills Company, Limited, is now using the word "Minneapolis" in connection with the flour manufactured by it elsewhere than at Minneapolis, the flour being sold under such name with the knowledge of all the other complainants, and without objection on the part of any of them; and is justifying such use by the assertion that the flour is made by the same methods, and with the same precautions, and under the same tests as are used in the mills situated in the said city of Minneapolis.

Upon the one principal issue made by the answer respecting the proper signification and meaning of the words "Minnesota Patent," "Minneapolis, Minnesota," and "Minneapolis, Minn.," as used upon sacks and barrels of flour, either alone or in connection with other flour brands and marks, the testimony is conclusive and overwhelming in favor of the complainants. Numerous affidavits, taken in the principal flour markets of this and other countries, prove beyond any doubt or cavil that these words so used signify to the dealer, the purchaser, and the consumer that the flour is made by the roller or patent process at Minneapolis, in the state of Minnesota, and that it is this fact which has given to the flour so branded its uniform great credit for excellence in the markets of the world, not alone in this country, but in South America, Europe, China, Japan, South Africa, and wherever flour is imported from this country.

The defendant admits all the allegations of the bill in regard to first purchasing his flour of complainants, and putting it up at Minneapolis, and marking it as "Minnesota Patent, Minneapolis, Minnesota" flour, and afterwards purchasing in Milwaukee, and putting up and selling under the same brands, but denies that the complainants have a right to invoke the interposition of this court to prevent him from the continued use of such brands; and it only remains to be seen whether the complainants have any such right, and whether this court has any power to grant the relief sought. The principal allegations of the bill being either conceded or proven, the injunction ought to go if the complainants make a case, and the bill is not demurrable. The application for an injunction was denied by the court below, but it is difficult to see wherein the facts lack anything of making a good case in equity. Upon the evidence the fraud is open and palpable, as is also the damage to the complainants' business and to the public resulting from it. This being the case, are the hands of a court of equity tied by any controlling circumstance or iron rule which forbids it to grant relief? We think not. Just when it first came into the defendant's mind that the terms "Minnesota Patent" and "Minneapolis, Minnesota" related only to the roller patent process which might be carried on in any part of the world, and had no reference to the place of manufacture, is not clear from the record; most probably, however, it was after, as he admits, partly by his own business enterprise, and partly by the use of these brands, he had succeeded in building up a prosperous business, and when he had conceived the idea of getting his flour elsewhere, but at the same time continuing the use of the old brands, which had been so successful. But, however this may be, when the defendant failed utterly to make good his defense in regard to the alleged proper meaning of the words used as a part of his brand, there was left small ground for him to stand upon. He was fairly beaten in his defense by the testimony. After that to still say that the court has no jurisdiction or power to grant relief is to fly in the face of the well-grounded principle running through all the cases that fraud accompanied by damages is actionable at law, and that, where one person has so dressed out his goods as to deceive the public into the belief that they are really the goods of another person, and so put them upon the market, to the manifest injury of that person and of the public, an action at law will lie for the deceit, and, to save a multiplicity of suits, and prevent irreparable injury, equity will restrain such unfair and fraudulent competition. This rule is so well established, is so general and elastic in its application, and so consonant to the general principles of equity jurisprudence, that it would be difficult to frame a case coming fairly within its spirit and meaning in which a court of chancery will not find a way to afford the proper relief. This principle is affirmed in many of the leading cases.

In the recent English case, quite analogous to this, of Saxlehner v. Apollinaris Co., 13 Times Law Rep. 258, plaintiff was the owner of a spring in Hungary named "Hunyadi Janos." Defendant, once the exclusive agent in England for the sale of the spring water, on

expiration of the contract, began selling water from a spring near Budapest, which was styled "Uj Hunyadi." The injunction went, and Mr. Justice Kekewich said:

"The plaintiff's case, as thus opened, was brought distinctly within the authority of Reddaway v. Banham [1896] App. Cas. 199, which, be it observed, was decided by the house of lords some time before writ issued. It is important to note what that authority really is. There is no novelty in the principle stated, and even the language finds a counterpart in many older cases, such as Seixo v. Provezende, 1 Ch. App. 192; but yet the law is so clearly put on a simple and intelligent basis that one necessarily makes it the starting point in consideration of questions of this class. I have studied the case with this view, and it seems to me the entire doctrine is summed up in one sentence in the first paragraph of the lord chancellor's speech moving the judgment of the house, 'Nobody has any right to represent his goods as the goods of somebody else.' Observe that the proposition is perfectly general. There is no limit as regards name, origin, honesty of manufacture or sale, or otherwise; and, although there are elsewhere to be found learned and useful disquisitions on the facts of the particular case, the application of the law to them, and criticism of earlier authorities, there is no departure from what the lord chancellor states to be 'the principle of law.' It matters not, therefore, how a plaintiff's goods come to acquire a particular value, or how the defendant's goods have come to adopt that value. If, in fact, the defendant is selling his goods as those of the plaintiff, he is doing what the law will not allow, and the plaintiff is entitled to relief against him."

In Newman v. Alvord, 51 N. Y. 189, also much like to this in principle, the trade-mark used by the plaintiffs was the word "Akron" in designating a cement made by them near the village of Akron, in Erie county, state of New York. This word had been used by the plaintiffs and their predecessors in business about 13 years, to designate the origin and quality of their cement. The defendants, who manufactured cement in Onondaga county, near Syracuse, knowing that the plaintiffs had for years used the word "Akron" as a trade-mark to designate the origin and place of manufacturing their cement, applied the word to designate their cement by calling it "Akron Cement." The plaintiffs' barrels were labeled as follows: "Newman's Akron Cement, manufactured at Akron, N. Y. The hydraulic cement known as the 'Akron Water Lime.'" The defendants labeled their barrels: "Alvord's Onondaga Akron Cement or Water Lime, manufactured at Syracuse, N. Y." They placed the word "Akron" upon their label for precisely the same reason that the defendant in this case placed the words "Minnesota Patent, Minneapolis, Minn." upon his flour sacks and barrels, to increase their sales, and avail themselves of the reputation acquired by plaintiffs' cement. The label, as said by Earle, J., who delivered the opinion of the court of appeals, was calculated to induce ordinary buyers to believe that they were purchasing either plaintiffs' cement, or cement of the same kind and value. The sole question to be determined, as stated by the learned justice, was whether the plaintiffs, who were the only persons engaged in manufacturing and selling the Akron cement which was known and had a reputation in the market as such, could be protected in the use of the word "Akron" against the defendants, who used it to defraud the plaintiffs and deceive the public. And the court thought the plaintiffs were entitled to the injunction. The principle upon which the relief was granted, as stated in the opinion, is that the defendants shall

not be permitted, by the adoption of a trade-mark which is untrue and deceptive, to sell their own goods as the goods of the plaintiffs, thus injuring the plaintiffs and defrauding the public.    The plaintiffs, as the court held, had given a reputation to the Akron cement in market. They had always been its principal manufacturers and sellers, and at the time of the commencement of the suit the sole parties who could be injured by the fraudulent use of the trade-mark by the defendants; and hence they were clearly entitled to the protection which they sought.    This case, which is quite analogous in principle to the case at bar, has been cited and approved by the supreme court of the United States in Canal Co. v. Clark, 13 Wall. 311, and McLean v. Fleming, 96 U. S. 245.    In the former of these cases the distinction between a trade-mark proper as indicating an exclusive right, and the use of a geographical name, as in the case at bar, where no exclusive property can be had, is clearly indicated.    In speaking of the case of Newman v. Alvord, after stating the facts of the case, the court say:

"It [the defendants' cement] was not in fact Akron cement (for Akron and Syracuse were a long distance from each other), and the purpose of calling it such was evidently to induce the public to believe that it was the article made by the plaintiffs.    The act of the defendants was, therefore, an attempted fraud, and they were restrained from applying the word 'Akron' to their manufacture.    But the case does not rule that any other manufacturer at Akron might not have called his product 'Akron Cement' or 'Akron Water Lime.'    On the contrary, it substantially concedes that the plaintiffs, by their prior appropriation of the name of the town in connection with the words 'cement' and 'lime' acquired no exclusive right to use it as against any one who could use it with truth."

So in the case at bar, the complainants can have no exclusive right to the use of the geographical names of "Minneapolis" or "Minnesota." They are not the subject of a trade-mark proper.    Any one or more of the two hundred thousand inhabitants of Minneapolis may use that word upon their flour.    The defendant or any other person from any state may go there, and establish a mill, and brand his flour "Minnesota Patent" and "Minneapolis, Minnesota."    The defendant might have continued to buy Minneapolis flour, and branded it "Minneapolis, Minn.," and had all the benefit which these marks would give him in the market, because he would be adhering to truth and fair dealing.    But when he placed these same brands upon another flour, manufactured in Wisconsin, he departed from the truth, and placed a lying brand upon his goods, which was intended to deceive, and could not but deceive, the public, and result in injury to the complainants' business.    If the defendant could do this, all other persons could do the same thing, and so the public would be defrauded, and the good will and business of complainants, which has taken 39 years to build up, would be greatly impaired, if not destroyed.    If this could be permitted, there would not be much incitement to provide the public with a high grade of flour, such as the complainants have been manufacturing for many years, and which the evidence shows has led the markets of the world, if, by all manufacturers using the same brand, the complainants' flour may be confounded with all lesser grades and kinds made from all sorts and grades of wheat.    It must be conceded that, if the private interests involved are great, the public

interests are no less so. In the examination of scores of cases referred to in the briefs of counsel, we find very little difference in opinion on this subject. The distinction, both in the English and American cases, is between those where a geographical name has been adopted and claimed as a trade-mark proper, and those where, as in the case at bar, it has been adopted first as merely indicating the place of manufacture, and afterwards, in course of time, has become a well-known sign and synonym for superior excellence. In the latter class of cases, persons residing at other places will not be permitted to use the geographical name so adopted as a brand or label for similar goods for the mere purpose by fraud and false representation of appropriating the good will and business which long-continued industry and skill and a generous use of capital has rightfully built up. It will be of no avail in such cases, where the facts are admitted or proven, to allege a want of power in a court of equity to find a remedy. The court has always exercised this jurisdiction, and must continue to do so.

In Lee v. Haley, 5 Ch. App. 155, the plaintiffs had for a series of years carried on business as coal dealers in Pall Mall, London, under the name of "The Guinea Coal Company," and they were frequently called the "Pall Mall Guinea Coal Company." The defendant, who had been their manager, finally set up a business in the same street under the same style of the "Pall Mall Guinea Coal Company"; and, while it appeared that there were other Guinea coal companies in London, so that the plaintiffs did not have the exclusive right to use the trade-mark "Guinea Coal Company," yet the court held that they were entitled, as against the defendant, to be protected in the use of the name. Lord Justice Gifford, delivering the opinion of the court, says:

"I quite agree that the plaintiffs have no property in the name, but the principle upon which the cases on this subject proceed is, not that there is property in the word, but that it is a fraud on a person who has established a trade, and carries it on under a given name, that some other person should assume the same name, or the same name with a slight alteration, in such a way as to induce persons to deal with him in the belief that they are dealing with the person who has given a reputation to the name."

Of course, this case goes further than it is necessary to carry the rule in the case at bar, because the words "Pall Mall Guinea Coal Company" could be truthfully used by both parties. They both sold coal in Pall Mall at a guinea a ton. But here the defendant could not truthfully call his flour "Minneapolis, Minn." flour, and his using these words was a fraud upon the complainants and upon the public.

In Southorn v. Reynolds, 12 Law T. (N. S.) 75, William Southorn established a clay-pipe factory at Brosely, Shropshire, and the product obtained a great repute as "Southorn's Brosely Pipes." He died, and two brothers—William and Edward—carried on the business at separate establishments, both using the name "Southorn Brosely," distinguishing their different factories by prefixing their initials. The pipes were made from a peculiar vein of clay used by both brothers, and the products of both of their factories were

known indifferently as "Southorn Brosely Pipes." Defendant, who had no establishment at Brosely, began to make "Reynolds' Purified Clay Pipes, made by Southorn from Brosely." It appeared that he had employed a former workman in one of the factories at Brosely whose name was Southorn. One of the brothers only brought suit for an injunction to restrain the use of the names "Southorn Brosely." The court held that a clear case of fraud and misrepresentation was made, and granted an injunction.

In Manufacturing Co. v. Gato (Fla.) 7 South. 24, the court, in stating the case, said:

"The complainant engaged in and commenced the manufacture and selling of cigars at Key West, Florida, in 1875; used exclusively Havana tobacco at his factory; and he established among purchasers, dealers, etc., a high reputation for his cigars, and his cigars still maintain said high reputation; and the climate at Key West is more favorable to the manufacture of Havana cigars than points north of that place; caused to be stamped or branded on his cigar boxes the words 'Key West,' and the words 'Key West,' 'E. H. Gato,' or 'Eduardo H. Gato,' and used the distinctive words 'Bouquet,' 'La Estrella,' and the words 'Key West' and 'E. H. Gato' and 'Eduardo H. Gato,' upon the boxes of his cigars and labels, etc., as trade-marks, and to distinguish his cigars in the market from cigars made and put upon the market by other manufacturers, long before the defendants made use of the said distinctive words upon boxes of cigars, labeled and printed thereon as hereinafter stated and complained of. Defendants, or one or more of them, about the year 1882, commenced to manufacture cigars at Jacksonville, Florida, under the name and style of the firm of 'El Modelo Cigar Manufacturing Co.' or 'Company,' and made their cigars of seed tobacco, a much inferior quality of tobacco to the Havana tobacco, in the estimation of dealers, and is in point of fact a greatly inferior tobacco to the Havana tobacco, and well known to all manufacturers. The defendants, well knowing the superiority of plaintiff's cigars, brand and stamp upon the boxes containing their cigars manufactured at Jacksonville, and print upon the labels, pictures, and paper upon said boxes, the words 'Key West' and 'G. H. Gato,' in conspicuous places upon said boxes, and in form and size of letters identical with or similar to the form and size of letters employed and used by complainant upon his boxes of cigars and labels and pictures thereon."

It was held that, "when a man manufactures his goods at a particular place, and uses the name of that place in combination with other words as a trade-mark to distinguish the origin or ownership of his goods, no other person will be permitted to use the name of the same place, upon goods manufactured by him at another and different place,"—citing Canal Co. v. Clark, 13 Wall. 325; Congress & Empire Spring Co. v. High Rock Congress Spring Co., 45 N. Y. 291; Newman v. Alvord, 51 N. Y. 189; Manufacturing Co. v. Hall, 61 N. Y. 226; Sawyer v. Horn, 1 Fed. 24; Gilman v. Hunnewell, 122 Mass. 139; Robertson v. Berry, 50 Md. 591, 33 Am. Rep. 337, note 1. And that, after the complainant, whose factory was located at Key West, had adopted his own name in combination with the words "Key West," "La Estrella," and "Bouquet," and certain brands, labels, and pictures, as his trade-marks, the defendants did not afterwards have the right to adopt the name G. H. Gato in combination with the words "Estrella," "Bouquet," and "Key West," and certain brands, labels, and pictures, in combination with the name G. H. Gato, as their trade-marks, where the words so adopted by them so clearly resembled the trade-marks so adopted by the complainant as to enable them to palm off upon and induce an ordinary pur-

chaser to buy their cigars for those of the complainant, whereby the defendants might be profited, and the complainant might be injured.

In City of Carlsbad v. Kutnow, 68 Fed. 794, the city of Carlsbad, as proprietor of the Carlsbad springs, had for years evaporated the waters into salts, which were sold as "Carlsbad Sprudel Salz." Defendants, who were New York druggists, made a similar salt, without the use of the genuine Carlsbad water, and sold it under the name "Improved Effervescent Carlsbad Powder." Judge Wheeler, in granting the injunction, said:

"If any artificial salts have come to be known by the name of 'Carlsbad Salts,' from similarity or otherwise, of course the defendants have the same right to sell such salts by that name that they have to sell anything by the name by which it is known. But there is no real evidence to that effect. And if the defendants procured genuine Carlsbad waters or salts, and put them up in different forms, or with other ingredients, to improve their taste or vary their effects, these words would be truthful, and they would seem to have a clear right to use them in such preparations; but the plaintiffs' proof tends to show that the defendants' salts are not, in substance, genuine Carlsbad salts, in any form, and the leading defendant has been a witness, and has not assumed to state—and, although the proof must be within their reach, none has been produced to show—that their salts come direct, in any form, from the Carlsbad springs. The impression left by the evidence is that they do not, but are artificial. No proof has been brought showing that the plaintiffs have used the name of 'Carlsbad' upon any but genuine Carlsbad Sprudel Salts. As the case stands here, the defendants appear to be using the name 'Carlsbad' upon artificial salts having no connection with that name, and to be using it only because of its connection with the genuine Carlsbad Sprudel Salts. Carlsbad, with its springs, is far away. This use of the name in connection with a preparation so similar to this well-known product of them is some representation that it is a genuine product of them. Calling the powder 'Improved Carlsbad' is a direct representation that genuine Carlsbad powder has been taken to be improved upon; and calling it also 'effervescent' is a representation that the improvement is in the effervescence. This is putting the plaintiffs' mark, to some extent, upon the defendants' salts, and is calculated to lead customers to think they are the salts of the plaintiffs. Such deception would be actionable at law, and is preventable in equity. McLean v. Fleming, 96 U. S. 245; Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143; Improved Fig Syrup Co. v. California Fig Syrup Co., 4 C. C. A. 264, 54 Fed. 175; Von Mumm v. Frash, 56 Fed. 830. Allusion has been made to this word being the name of the city, to which ordinarily an exclusive right cannot be acquired; but it is also the name of these peculiar springs, and gives the name to their products."

And on appeal (35 U. S. App. 750, 18 C. C. A. 24, and 71 Fed. 167) the court, in affirming the order, by Judge Lacombe said:

"The Carlsbad Sprudel Salts in either form, therefore, is a natural product, and well known as such; and there is no proof in the case that the complainants have used the name 'Carlsbad' upon anything but genuine Carlsbad Sprudel Salts. And we concur with the circuit judge in the finding that there is no evidence in the record that any artificial salts have, from similarity or otherwise, come to be known by the name of 'Carlsbad,' as is the case with the Epsom salts, a term now generally applied to sulphate of magnesia whether such sulphate of magnesia comes from Epsom or not. Under these circumstances the complainant, the city of Carlsbad, has the right to indicate the origin of these natural salts by its own name, and would be entitled to the aid of a court of equity to prevent any one from using that name to induce the public to accept as genuine artificial salts not the product of the Carlsbad springs."

In Kinney v. Basch, 16 Am. Law Reg. (N. S.) 596, plaintiffs manufactured cigarettes, and used a label with a field of divergent rays and the word "St. James" and the symbol "1/2." The cigarettes

were distinguished on the market as "St. James." Defendants em
ployed a label of the same size, differing slightly in color, contain-
ing the words "St. James Perique Cigarettes," with the symbol
"1/2." It was shown there was a St. James parish in Louisiana,
and St. James perique tobacco was a common article. The symbol
"1/2" meant mixed goods, and was so used by the trade. In regard
to the right of the plaintiff to the use of the word "St. James"
and the figures "1/2," the court said:

"It has been urged upon the part of the defendants that geographical names
cannot be the subject of a trade-mark; neither can numerals, which only serve
to indicate the nature, kind, and quality of an article. It is true that the cases
cited by the defendants sustain these propositions, but the later cases have pro-
ceeded upon different and more equitable principles in defining the grounds
upon which courts of equity interfere in cases of this description. This inter-
ference, instead of being founded upon the theory of protection to the owner's
trade-marks, is now supported mainly to prevent frauds upon the public. If
the use of any words, numerals, or symbols is adopted for the purpose of de-
frauding the public, the courts will interfere, and protect the public from such
fraudulent intent, even though the person asking the intervention of the court
may not have the exclusive right to the use of these words, numerals, or sym-
bols. This doctrine is fully supported by the latest English cases of Lea v.
Haley, 5 Ch. App. 155; Wotherspoon v. Currie, L. R. 5 H. L. 508; and also in
the case of Newman v. Alvord, 51 N. Y. 189."

In Association v. Piza, 24 Fed. 149, complainant, doing business at
St. Louis, Mo., had been accustomed to export beer in bottles with
a label bearing the words "St. Louis Lager Beer." It had an estab-
lished market for this product in South America and Panama. Neith-
er defendant nor any other person in the export trade had been accus-
tomed to use the words "St. Louis Lager Beer." Defendant shipped
beer from New York in competition with complainant. It was shown
that at Panama and in South America "St. Louis Lager Beer" was in
demand. Defendant's beer was made in New York, and his bottles
were so labeled as to represent that the beer was made at St. Louis,
and that his firm were the sole agents for the St. Louis lager beer.
Defendant insisted that buyers did not discriminate between complain-
ant's article and other beer in the United States, but bought it simply
because they supposed St. Louis beer was produced in the United
States, as distinguished from German and English beer; but the
court said:

"This may be true; but, if it is, it does not seem to be conclusive against the
right of the complainant to the injunction which he seeks. As the goods of the
parties go to the same market, it can hardly fail to happen that the complain-
ant will lose sales, and the defendant will get customers, in consequence of de-
fendant's acts. Although the complainant cannot have an exclusive property
in the words 'St. Louis' as a trade-mark, or an exclusive right to designate its
beer by the name 'St. Louis Lager Beer,' yet, as its beer has always been made
at that city, its use of the designation upon its labels is entirely legitimate; and
if the defendant is diverting complainant's trade by any practices designed
to mislead its customers, whether these acts consist in simulating its labels, or
representing in any other way his products as those of complainant, the latter
is entitled to protection. It is no answer for the defendant, when the com-
plainant asks for protection, to say that it has no exclusive right to designate
its product in the manner it has, although this might very properly be asserted
by a competitor selling beer made at St. Louis, or who, by reason of any cir-
cumstances, might be entitled to represent his product as originating there.
Canal Co. v. Clark, 13 Wall. 322. It is unnecessary, for present purposes, to

consider whether the complainant has a valid trade-mark, or can have a technical trade-mark, in the name 'St. Louis.' It is sufficient that it was lawful for the complainant to use that name to designate its property, that by doing so it has acquired a trade which is valuable to it, and that the defendant's acts are fraudulent, and create a dishonest competition, detrimental to the public."

In Lead Co. v. Cary, 25 Fed. 125, complainant, a manufacturer of white lead in St. Louis, stamped upon the upper end or head of its kegs the words "Southern Company, St. Louis." These words encircle the head of the keg, "St. Louis" forming the lower half of the circle, and "Southern Company" the upper half, inclosing the words, "Warranted Strictly Pure White Lead in Pure Linseed Oil." St. Louis had an established reputation for the manufacture and sale of pure white lead, and complainant had maintained for years a large trade at that place as a manufacturer. Defendants manufactured their lead at Chicago, branding it "Southwestern, St. Louis," surrounding the words "Strictly Pure White Lead"; the words "Southwestern St. Louis" appearing in the same form as the words "Southern Company, St. Louis." Defendants also pasted a label on their kegs, stating it was strictly pure. Analysis showed complainant's lead to be pure and defendants' to be adulterated. Gresham, C. J. said:

"I shall not stop to inquire whether the complainant's claim to trade-mark is or is not well founded, as I think it is entitled to an injunction upon another ground. The defendants so brand the heads of their kegs as to naturally mislead and induce persons purchasing for consumption to suppose they are purchasing complainant's lead, when they are getting an inferior article. The brand used by the defendants is so like the complainant's as to induce the public to mistake the one for the other. The defendants sell their goods to retail dealers, and it may be that such dealers are not deceived, but they sell to consumers who are or may be deceived. The complainant is entitled to relief if the brand used by the defendants sufficiently resembles the complainant's brand to be mistaken for it, and the defendants adopted their brand for the purpose of selling their kegs as the kegs of complainant, or for the purpose of enabling retail dealers to do so, and the complainant has been injured by this fraud, or is likely to be injured by it. The complainant manufactures its genuine white lead at St. Louis, and its reputation is already established as a manufacturer and dealer of this character. The defendants manufacture their adulterated and greatly inferior lead at Chicago, and stamp upon their kegs a false brand in imitation of the complainant's brand. Why is this done unless it be in the hope of deceiving the public and injuring the complainant? Realizing that they could not engage in open, manly competition with the complainant, the defendants resort to a palpable trick. If this resulted in no injury to the complainant, or was likely to result in no injury to it, the bill would have to be dismissed. But the affidavits show that the defendants' kegs can and have been sold as the complainant's."

Judge Blodgett, in Lead Co. v. Coit, 39 Fed. 492, made the same ruling upon the same facts.

In A. F. Pike Mfg. Co. v. Cleveland Stone Co., 35 Fed. 896, it was sought to protect the names "Green Mountain," "Willoughby Lake," "Lamoille," and others as designating scythe stone, which had been used by complainant and its predecessors for a number of years. Defendants acquired a quarry adjacent to complainant's, and branded theirs in the same way. It was urged, first, that the brands employed by defendants did not infringe. Defendants used the exact words "Lamoille," "Green Mountain," and others, but in place of "Willoughby Lake" employed the title "Willoughby Ridge." It was ruled that

the titles employed were infringements. It was next urged that the brands as applied to scythe stones indicated the quality or grit of the stones. The court said that they did not designate alone quality, but also indicated selection and care in the manufacture, and finally:

"It is urged that 'Lamoille' and 'Willoughby Lake' are geographical terms. The defendants quarry stones 200 miles from Lamoille county and Willoughby Lake, and apply the names 'Lamoille' and 'Willoughby Ridge.' Assuming that complainant cannot have a valid trade-mark in these names, which I do not decide, it seems to be well settled that a manufacturer will be protected in the use of a geographical name as against one who does not carry on business in the district so designated. Blackwell v. Dibrell, 3 Hughes, 160, Fed. Cas. No. 1,475; Newman v. Alvord, 49 Barb. 588, 51 N. Y. 189."

The same doctrine was upheld in Northcutt v. Turney (Ky.) 41 S. W. 21. The complainants were the owners of what are called and known as the Upper and Lower Blue Lick springs in Nicholas county, Kentucky, and brought suit to enjoin Northcutt from using the words "Blue Lick" in connection with his advertisement and sale of water from an artesian well in Campbell county. The court, in affirming the right to an injunction, said:

"It is substantially alleged and admitted that water from the two springs of appellees have been for a century known, sold, and used throughout the United States and many foreign countries as medicinal water, and also that they and those under whom they claim have, by long use and legal adoption, acquired exclusive right to the use of the words 'Blue Lick' as their trade-mark. Though Upper and Lower Blue Lick springs are some distance apart, and belong to two distinct firms, the water from them seems to be composed of the same ingredients, and to possess the same kind and combination of medicinal qualities. And, as the trade-mark 'Blue Lick Water' has been heretofore appropriately and legally adopted and used by each representative owner without objection of either, they have a common interest in preventing a third party illegally appropriating and using it, and, consequently, have a right to jointly maintain this action. Appellant states in his answer that he and those who preceded him have been selling and shipping water from said artesian well for a period of at least sixteen years; that for about one year of that time the trade-mark or brand used in the sale of said water was 'The Campbell County Blue Lick Water,' and for about fifteen years last past the trade-mark or brand used by him and the former owners and proprietors in sale of said waters has been 'Kentucky Blue Lick Water.' And the two defenses based upon this alleged statement of fact are: First, that appellees, having knowledge thereof, and acquiescing in such use of the words 'Blue Lick Water' by appellant and his predecessors, is now estopped to deny their right or interfere with the exercise of it by them; second, that the action is barred by the statute of limitation. That appellees acquired exclusive right to use as their trade-mark the words 'Blue Lick Water' is not only apparent from the facts stated in their petition, and conceded in the answer of appellant to be true, but has been definitely decided by this court in the case of Water Co. v. Hawkins (Ky.) 26 S. W. 389. Such being the case, the use and attempted appropriation of the same words by the predecessor of appellant, in advertising and selling water from the artesian well, was manifestly illegal and fraudulent."

Since the case of Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151, was decided, holding that the word "Columbia" placed upon flour sacks could not constitute a proper trade-mark word so as to give the person using it an exclusive right, no one would be so hardy as to claim that an exclusive right to the use of a geographical name could be acquired as a trade-mark proper. Indeed, the doctrine of that case was not new in 1893, but has been the leading doctrine on the subject both in this country and England for many years, as is clearly shown

by the cases already cited. There is no inconsistency between that case and the previous decisions of the state and federal courts in this country, including the decisions of the United States supreme court before cited, to the effect that "wrongs of this description, whereby, through an artifice of any sort, the goods of one manufacturer become confused in the public mind with goods of some other manufacturer, may be redressed in a court of equity." Merriam v. Clothing Co., 47 Fed. 411.

In the case of Pillsbury v. Mills Co., 24 U. S. App. 395, 12 C. C. A. 432, and 64 Fed. 841, which, like this, was a case of unfair and fraudulent competition, Jenkins, Circuit Judge, speaking for the court, says:

"In the consideration of this question we have not overlooked the case of Mill Co. v. Alcorn. That was the case of a trade-mark pure and simple, in which it was held that one cannot acquire the right to the exclusive use of the word 'Columbia.' * * * There the proof failed to establish that the brand was calculated to mislead or deceive. Here the proof is overwhelming to the effect that the brand used was designed to mislead, and actually did deceive and mislead."

Since the case of Mill Co. v. Alcorn was decided, a question arose in the United States circuit court for the district of New Jersey in Envelope Co. v. Walton, decided in 1897, and reported in 82 Fed. 469, in reference to the use of the same word "Columbia" in connection with certain symbolical representations of Columbia by different dealers who had placed it upon their packages of tissue paper. The complainants brought their bill to restrain the use of the word "Columbia" and the allegorical representation, alleging that they had used it for more than 10 years continuously to distinguish their manufacture of a superior quality of tissue paper, and charging the defendants with the use of the same words and representations upon a tissue paper manufactured by them, and in such a manner as to constitute unfair and fraudulent competition. The defendants were allowed, besides answering, to file a cross bill, by which they set up that they had employed the word "Columbia" and a symbolical or allegorical representation of "Columbia" upon their packages for a period of 17 years and longer before the complainants had employed them. The court, in deciding the case in favor of the defendants, granting the injunction asked for in the cross bill, says:

"There cannot be any question that under these circumstances there is grave danger that the goods may be mistaken the one for the other. If the question presented were only the one raised by the complainants' bill, I should not hesitate to grant them the relief asked for; but the prior application by the defendants of the word 'Columbia' to the same product changes the situation of the parties. It cannot be said that Walton & Co. acquired a technical trade-mark in the word 'Columbia,' in view of the decision of Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151; but that they were the first persons, so far as the records shows, to apply the word to this article of production, cannot be disputed. By such application and continued use their paper became known to the trade and the public generally. It acquired a reputation for quality, and the name was a distinctive mark of excellence. The figure of 'Columbia' afterwards added by the complainants cannot be regarded as more than a mere amplification of the word 'Columbia' previously appropriated. It conveys no fur-

ther or other idea than the word, and can be regarded only as a different way of expressing it. It is apparent that, inasmuch as none of the wrappers in controversy bear the names of the makers, the packages must be known and designated and called for by the users as 'Columbia paper,' whether the word 'Columbia' be expressed in letters alone, or in a figure typifying 'Columbia.' So it would happen that, whether a purchaser wanted the package of the complainants or the defendants, he must ask for Columbia paper. It would be impossible for the seller to know which of the manufactured articles was desired, and the public would be rendered liable to have imposed upon it goods which they did not want. Such a condition must inevitably lead to confusion in the trade, disappointment to the general public, deception of ultimate purchasers, and be productive of unfair competition in trade. Orr v. Johnston, 13 Ch. Div. 434; Sawyer v. Horn, 4 Hughes, 239, 1 Fed. 24. One cannot be permitted to practice deception in the sale of his goods as those of another, 'nor to use the means which contribute to that end.' Perry v. Truefitt, 6 Beav. 66. Irrespective of the question of trade-mark, inasmuch as Walton & Co. appear to have been the first to put up their paper with the distinguishing mark 'Columbia,' and as their goods were the first to become known to purchasers as 'Columbia Paper,' no other person should be permitted to use that name as the sole distinguishing mark of a like article, whether expressed in letters or by figure, and in that manner mislead the general public into buying his goods as those of his competitor. If the word could not be used as a trade-mark, it is to be treated as a descriptive term, to the benefit of which they are entitled. Wilson v. T. H. Garrett & Co., 47 U. S. App. 250, 24 C. C. A. 173, and 78 Fed. 472."

The following are some other of the leading cases which we have examined, and which affirm the same general principle: Reddaway v. Hemp-Spinning Co. [1892] 2 Q. B. 639, 9 Rep. Pat. Cas. 503; Powell v. Brewing Co., 11 Rep. Pat. Cas. 563, 13 Rep. Pat. Cas. 235; Paine v. Daniell, 10 Rep. Pat. Cas. 217; Hine v. Last, 7 Law T. 41; Braham v. Beachim, 7 Ch. Div. 848; Knott v. Morgan, 2 Keen, 214; Magnolia Metal Co. v. Atlas Metal Co., 14 Rep. Pat. Cas. 389; Society of Accountants v. Corporation of Accountants, 20 Scot. Sess. Cas. (4th Series) 750; Dunnachie v. Young, 10 Scot. Sess. Cas. (4th Series) 874. In this last case the following remarks of Lord Craighill seem peculiarly applicable to the case at bar:

" 'Glenboig,' as used by the respondents, and without any explanation of the sense in which the word was used, could not but be a description almost certainly leading to a deception. The lord ordinary appears to me to have been insensible to this consideration. He thinks that because Dunnachie made 'Glenboig' a part of his trade-mark, the word must be held to be publici juris,—misreading the Case of Seixo, as I think. But Dunnachie was on Glenboig; the clay he used was raised and manufactured there; and in putting the name of the place into his trade-mark he was only following the course ordinarily pursued. The respondents, however, are not on Glenboig. In taking that word they took it only because it denoted goods known in the market to be of high quality; and, if they are to find virtue in it, this will only be because those who at first or second hand are the purchasers of their goods read the word as indicating that the goods are the product of a manufactory other than Heathfield. The respondents try to justify their assumption of Glenboig, first, on the ground that their clay is of the same seam; and, second, that the word 'Glenboig,' as used by them, is qualified by the word 'Young's,' and so misapprehension, not to say deception, is prevented. The fact assumed in the former of these grounds has, I think, been established, but it is insufficient as a justification. The least that can be said on the subject is that the word, as used, is ambiguous. That, in my opinion, would be enough. Why should the respondents use a word that may mislead,—that may lead people to buy their goods as the goods of the complainers? If all the respondents desired to suggest is that their bricks are made of the clay of the Glenboig seam raised on Heathfield, a word or words could be introduced by which this could be communicated."

Every case, as has often been adjudged, must rest upon its own circumstances; but this case and many others already quoted seem quite indistinguishable on principle from the case in hand. The result of all the cases is that the question must come down to one of fair or fraudulent competition. Thread Co. v. Armitage, 67 Fed. 897, affirmed 74 Fed. 936;[1] Merriam v. Publishing Co., 49 Fed. 944; Seixo v. Provezende, 1 Ch. App. 192; Lead Co. v. Masury, 25 Barb. 417; Wotherspoon v. Currie, L. R. 5 H. L. 508; Myers v. Buggy Co., 54 Mich. 215, 19 N. W. 961, and 20 N. W. 545; Keller v. Goodrich Co. (Ind. Sup.) 19 N. E. 196; Companie General v. Rehder, 5 Rep. Pat. Cas. 61; Free Fishers & Dredgers of Whitstable v. Elliott, 4 Law T. 273; Thompson v. Montgomery, 41 Ch. Div. 35. This last case is very analogous to the case at bar. The plaintiff had established a brewery at a place called "Stone," where he had long carried on business, and whence his ale, under the denomination "Stone Ale," had acquired a reputation. Lord Lindley, in reversing the order denying an injunction, said:

"The plaintiff's rights are to prevent anybody from passing off his goods.as the goods of the plaintiff, which is indeed the very substance and kernel of the cases on this subject. California Fig Syrup Co. v. Taylor Drug Co., Limited, 14 Rep. Pat. Cas. 341."

In McAndrew v. Bassett, 4 De Gex, J. & S. 380, the plaintiffs were large manufacturers of licorice. They styled this licorice "Anatolia." Anatolia was the name applied to a whole tract of country wherein licorice root is largely grown. At the time plaintiffs began to use the word there was no other manufacturer of licorice stamping it with this word. Subsequently, in response to an order for Anatolia licorice, defendants caused a stamp to be prepared containing the word "Anatolia," and put it on the goods, and afterwards continued to use it. The court below granted a perpetual injunction restraining the use of the word "Anatolia" by the defendants on licorice. In response to the argument that the word "Anatolia" was common to all, the court said:

"That argument is merely a repetition of the fallacy which I have frequently had occasion to expose. The property in the word for all purposes cannot exist, but property in that word, as applied by way of stamp upon the particular vendible article as a stick of licorice, does exist the moment the article goes into the market so stamped, and there obtained acceptance and reputation, whereby the stamp gets currency as an indication of superior quality, or some other circumstance, which renders the article so stamped acceptable to the public."

In Van Horn v. Coogan (N. J. Ch.) 28 Atl. 788, plaintiff and its predecessors had, at Newark, N. J., for a great many years, manufactured and sold stoves and ranges under the style of "Portland Stoves and Ranges." Defendants carried on business very close to plaintiff, and began to make, advertise, and sell "Famous Portland Ranges." It was insisted that there could be no trade-mark in the word "Portland" because it was a geographical name, and on this point the court said:

"But it is contended that a geographical name, like 'Portland,' cannot be a trade-mark, nor to be so used as to give the dealer who first adopts it an exclusive property in it. This, I think, may be conceded, without impairing in the slightest degree the complainant's right to the protection it asks; for, as

[1] 21 C. C. A. 178.

was said, in substance, by Lord Langdale, in the case just cited, the question, in cases like this, is not whether the complainant has a property in the name by which his goods are distinguished in the market; but, on the contrary, the pertinent inquiry is, has the defendant a right to use the name by which the complainant's goods are known, for the purposes of deception, and in order to attract to himself that custom which, without the improper use of such name, would have flowed to the complainant? And the answer to the inquiry is that the defendant has no such right. The supreme court of the United States in Coats v. Thread Co., 149 U. S. 562, 566, 13 Sup. Ct. 966, recently said, speaking by Mr. Justice Brown, that there can be no question as to the soundness of the proposition that, irrespective of the technical question of trade-mark, one trader has no right to dress up his goods in such manner as to deceive an intending purchaser, and induce him to believe he is buying the goods of a rival trader. 'Rival manufacturers may lawfully compete for the patronage of the public in the price and quality of their goods, in the beauty and tastefulness of their inclosing packages, in the extent of their advertising, and in the employment of agents; but they have no right, by imitative devices, to beguile the public into buying their wares under the impression they are buying those of their rivals.' "

The same rule prevails in the French and German law, and is comprehensively thus laid down in Kohler, Trade-Marks:

"Much more important is a second kind of fraudulent competition,—so important that many legislatures especially single it out, and have passed particularly severe rules regulating it. It is one of the most common practices to designate the products of a place, if these products be of a particularly celebrated character, by the name of their place of origin. For commerce in cultivated plants this form of designation is a vital question, and in the same way for mineral products, for mineral waters, and so forth; and also for industrial and manufactured goods this designation has an eminent meaning, since the products of certain countries have their peculiar advantages and peculiarities, which come either from the peculiar quality of the raw material of a country, from the customary skill of the workmen, or perhaps from a special method of production long in vogue. The great popularity of such goods in demand, the ready sale which they find, and the profits which their production brings, are temptation enough for many traders to mark their goods also with the name of this locality, entirely foreign to them, in order to realize the advantages which this demand produces. Such practices often inflict the most deplorable damage upon the genuine and reputable products of those places, not only in that they rob them of a good part of the revenue directly, but the greatest damage consists in the depreciation which the indifferent wares, entirely foreign to the nature of the place from which they are said to come, inflict upon the entire locality, which they bring into bad repute. Before the public notices the deception, it has become disgusted with the inferior goods, and a flourishing branch of industry is ruined at a blow. In glowing colors, and without exaggeration, the terrible effect which such practices have upon industry has been depicted in the report of Lemcine des Mares in the French law of 1824. It states there particularly that several branches of industry 'owe to them the loss of their relations with foreign countries which closed their markets to them from the moment that they saw the most common product arrive under a name which heretofore they had been in the habit of respecting and honoring.' Pouillet, p. 707. It is just the trade with foreign countries that is most injured by these practices, because there the deception is far more difficult to detect, and the foreigner is easiest deceived in his perception of the true nature of the goods."

The cases in which a person has been enjoined from using his own name in connection with other labels or brands upon his goods proceed upon the same general ground of deceit and unfair competition in trade. If a person may be restrained from the use of his own name upon his own goods because such use, in the circumstances, will deceive the public into purchasing his goods believing them to be the goods of another, to the injury of the public and the good

will and business of such other person, so, also, on the like principle, may he be restrained from using any other proper or geographical name when such use will produce like results. Garrett v. T. H. Garrett & Co., 24 C. C. A. 173, 78 Fed. 473; William Rogers Mfg. Co. v. Rogers & Spurr Mfg. Co., 11 Fed. 495; R. W. Rogers Co. v. William Rogers Mfg. Co., 17 C. C. A. 576, 70 Fed. 1017; Landreth v. Landreth, 22 Fed. 41; Pillsbury v. Mills Co., 24 U. S. App. 395, 12 C. C. A. 432, and 64 Fed. 841; Tarrant v. Hoff, 22 C. C. A. 644, 76 Fed. 959; Meyer v. Medicine Co., 18 U. S. App. 372, 7 C. C. A. 558, and 58 Fed. 884; Walter Baker & Co. v. Baker, 77 Fed. 181; Brinsmead v. Brinsmead, 101 Law T. 606; Melachrino v. Melachrino, 4 Rep. Pat. Cas. 215; Barlow v. Johnson, 7 Rep. Pat. Cas. 395; Huntley v. Biscuit Co., 10 Rep. Pat. Cas. 277. It is hardly necessary to cite authority for the doctrine that in cases where the question is simply one of unfair competition in trade it is not essential there should be any exclusive or proprietary right in the words or labels used, in order to maintain the action. This has been decided by the United States supreme court both before and since the decision of Mill Co. v. Alcorn. See Coats v. Thread Co., 149 U. S. 562, 13 Sup. Ct. 966; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002. In the former of these cases the doctrine is distinctly and broadly announced that, "irrespective of any question of trade-marks, rival manufacturers have no right, by imitative devices, to beguile the public into buying their wares under the impression that they are buying those of their rivals."

In the defendant's brief and argument much reliance is placed upon the fact that one of the mills belonging to the Pillsbury-Washburn Co. is situate outside the city limits of Minneapolis. But, upon examination, this defense, much like the other defenses in the case, vanishes into "unsubstantial air" when viewed in the light of the evidence. The objection, if good at all, would go to show a misjoinder of parties; that is to say, that the Pillsbury Flour Mills Company should not have been joined with the six other corporations, all of whose mills are situate at the Falls of St. Anthony, within the city limits of Minneapolis. It would furnish no good reason for not granting the relief asked for as to the other complainants. The objection, if of any value, should, no doubt, have been taken by plea in abatement for the misjoinder of parties. A plea to the merits is held to be an admission not only of the competency of the plaintiffs to sue, but to sue in the particular action which they bring. Society for Propagation of Gospel v. Town of Pawlet, 4 Pet. 480. But upon the merits there is but little substance to this objection. The evidence shows that this Anoka mill has always been an integral part of the great Minneapolis milling plant belonging to the Pillsbury Flour Mills Company; that it has the same machinery, is run by the same proprietors, in the same manner, grinds the same grade of wheat, is subject to the like interchange of flour and tests; that the business of the mill has always been conducted in Minneapolis by the same parties in connection with that of their other mills, and has always been considered and treated as one of the Minneapolis mills. It is situated on a tributary of the Mississippi river, about 10 miles outside the city limits, in a small suburb of the city, only because there happened to be a water power

at that place. For these reasons, the public has not been deceived, because this, which is one of the smallest mills, has been practically for all purposes a Minneapolis mill, and part and parcel of the Pills-bury flouring plant in that city. There is nothing unusual, and it does not seem to be a material circumstance, that large manufacturing concerns carrying on business in a city should have some portion of their works outside the corporate limits; and it hardly requires the citation of authorities to the point that, where this is done, such business will be considered entitled to the same measure of protection as if carried on wholly within the corporate limits. See Kohler, Trade-Marks, 291; New York & R. Cement Co. v. Coplay Cement Co., 45 Fed. 212, where it is said that all cement manufacturers in Rosendale and vicinity may rightfully call their manufactured article "Rosendale Cement"; Stone Co. v. Wallace, 52 Fed. 431.

As we read the opinion of the court below (see 82 Fed. 816), the injunction was refused not only because the several complainants could have no exclusive interest in the words, the use of which by defendant is complained of, as a trade-mark, but on the further ground that the misuse of these words by the defendant cannot injuriously affect any one particular complainant, because they do not imply that any one in particular of the complainants manufactured the flour sold by the defendant. We think this ground not tenable. If the complainants were consolidated into one great business concern, this objection would be obviated, because then one corporation would manufacture all the flour made at Minneapolis, as now the several corporations complainant do. But, if such a corporation would be entitled to relief, we take it that any one or more of the complainant corporations having a common interest in preventing the fraud will also be entitled to maintain the action. In the judgment of the court it is the common every-day case of several persons having a common interest in the prevention of an irreparable injury joining together to obtain the desired relief. Though their interests are different in degree, they are of the same quality and kind. Any number of landowners may join together to enjoin the assessment and collection of an illegal tax upon real estate, or one or more may sue on their own behalf, and for the benefit of all others similarly situated. One landowner may own a thousand acres, and another but one. That makes no difference so long as their grievance is of the same character, though differing in degree, as affecting different persons. So, if a person attempts to erect a nuisance of any kind upon a block of land in a city where the lots to be affected are owned by different owners, any one may sue, or one or more may join together in asking for relief by injunction. The same principle is illustrated in the cases of common of pasturage or common of fishery, and the same rule prevails. The test is whether the parties have an interest in common in the subject-matter of the suit as well as in the question involved; whether, to use the language of Mr. Justice Nelson in Cutting v. Gilbert, 5 Blatchf. 259, 261, Fed. Cas. No. 3,519, approved by the supreme court in Scott v. Donald, 165 U. S. 107, 116, 17 Sup. Ct. 262, "there is a community of interest growing out of the nature and condition of the right in dispute; for, although there may not be any privity between the nu-

merous parties, there is a common title out of which the question arises, and which lies at the foundation of the proceeding." In all of these cases, and many more of like kind, any one may separately, but not jointly with another, maintain an action at law, or any one or any number together, to save multiplicity of suits, and prevent irreparable injury, may maintain a bill in equity to enjoin. The doctrine is too common to require the citation of authorities.

In the examination of the cases upon the subject of fraudulent competition in trade we have found many like this, where both individuals and corporations having a common interest have united together to maintain the action in equity, only one or two of which we will refer to. In the case of Society of Accountants v. Corporation of Accountants, 20 Scot. Sess. Cas. (4th Series) 750, the Society of Accountants in Edinburgh, the Institute of Accountants and Actuaries in Glasgow, and Society of Accountants in Aberdeen, three several and distinct societies, all incorporated by royal charter, as well as the individual members of each, joined in a suit to prevent the Corporation of Accountants, Limited, and certain of its members, from using the letters "C. A." (chartered accountants). From the date of the incorporation of complainants these letters had been used to designate their members, and were so understood by the public. Each of the complainant societies consisted of a body of professional men who had associated themselves for the purpose, inter alia, of keeping up a high standard of professional education and efficiency. The court, in granting the interdict, said:

"Here each of the corporations is not only incorporated, but each has a distinct patrimonial interest in enforcing its conditions of membership,—an interest attaching both to the corporations as such, but also to its individual members. But, if this be so,—if a wrong is done,—and a title to sue exists where there is only one corporation, does it make any difference that there are here three corporations, and that the injury consists in conduct which involves a false representation of membership of one or other of the three? I do not, I confess, see that this makes a difference in principle—at least assuming that, as here, the three corporations jointly complain. There may be a difference in degree, —that is to say, there may be a difference in the degree of the injury to each body individually,—but I think that that is all, and I am not able to hold that that is enough. Each corporation suffers a legal wrong, greater or less, and, that being conceded, the question becomes one merely of title to sue."

The case upon appeal was unanimously affirmed. The same rule was recognized and adopted in Northcutt v. Turney (Ky.) 41 S. W. 21. The order of the court below is reversed, and the case remanded, with instructions to grant the injunction as prayed.